CHARLOTTE L. MACKENZIE and ROMEYN BERRY, as Trustee under a Certain Trust Agreement Dated March 12, 1914, Respondents, v. SEABOARD NATIONAL BANK and Others, Appellants.

First Department, July 11, 1918.

Conversion — action to recover value of stocks which plaintiff intrusted to swindler — evidence not justifying recovery.

Action brought for the alleged conversion of certain stocks owned by the plaintiff. The cause involves a swindling scheme wherein an adventurer, having gained the confidence and affection of the plaintiff, was enabled to acquire possession of said stocks, which he at one time pledged with some of the defendants, but which he finally sold and converted the proceeds, etc. It further appeared that the plaintiff by various written communications to the depositaries of the stocks and to others apparently

confirmed the authority of said swindler to act for her and to finally perpetrate the fraud.

On all the evidence, *held*, that a verdict for the plaintiff was against the weight of evidence and that the judgment in her favor should be reversed and a new trial granted.

APPEAL by the defendants, Seaboard National Bank and others, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of New York on the 3d day of March, 1917, upon the verdict of a jury, and also from an order entered in said clerk's office on the 9th day of March, 1917, denying defendants' motion for a new trial made upon the minutes.

*Herman Aaron* of counsel [*Parker & Aaron*, attorneys], for the appellant Seaboard National Bank.

*Nathan L. Miller* of counsel [*Joseph M. Hartfield* with him on the brief; *White & Case*, attorneys], for the appellants Luke and others.

*Guthrie B. Plante* of counsel [*Charles E. Mahony* with him on the brief; *Morris, Plante & Saxe*, attorneys], for the respondents.

DOWLING, J.:

Plaintiffs' complaint sets forth ten separate causes of action, the first thereof being brought for the conversion of 1,104 shares of Singer Manufacturing Company stock, and the remaining causes of action having to do with all or part of said shares. The amount of testimony given herein together with the numerous exhibits render it impossible to more than outline the essential facts bearing on the plaintiffs' right to recover. On June 17, 1910, plaintiff was the owner of 1,104 shares of Singer Manufacturing Company stock represented by one certificate, No. 3417. This certificate represented a stock dividend declared by the company upon a similar number of shares which had been bequeathed to plaintiff by her husband. After his death, plaintiff traveled abroad and there made the acquaintance of one Richard J. Hartman, who represented himself as wealthy, with extensive business interests in Europe and in this country, and, claiming to be intimate with the leaders of the financial world, succeeded in

gaining the plaintiff's confidence as well as her affections, and by a course of duplicity and fraud ultimately deprived the plaintiff of practically all her property. The first reference to any financial transactions between these parties is contained in a letter of Hartman, without date, asking for the loan of steel stock to establish a bank credit, as it would be as safe as in the plaintiff's vault, and he offered to pay her six per cent interest while he used the stock and give her, when the " St. Louis Car matter " was concluded, $100,000 of the common stock of that company. On March 8, 1910, plaintiff wrote a letter to Van Schaick & Co., brokers, authorizing and instructing them to have transferred to their account for the use of Hartman, 100 shares of United States Steel preferred and 50 shares of Brooklyn Union Gas Company stock. The letter stated: " Mr. Hartman has full and complete authority to use these certificates and he knows my wishes in respect thereto." On September 27, 1910, plaintiff wrote the same firm, saying: " Mr. Hartman has my full authority to use the securities in my account, now with your house, as he may elect and to adjust any and all accounts and to do all that he may deem fit therewith— Reposing full confidence in him this letter gives you complete authority to accept his instructions in the premises and to be governed by his wishes in respect thereto." On April 28, 1911, plaintiff wrote to Hartman in London notifying him that she had given one Crandall 100 shares of Singer stock as she had promised Hartman — evidently a loan at Hartman's request. These shares of stock with 168 more of Singer Company stock were in Van Schaick's account when that firm failed September 12, 1911. The method by which, or the date when, these shares passed to the brokers does not appear. The brokerage firm of Van Schaick & Co. was in process of reorganization, and in connection therewith one of said firm brought Hartman to William S. McGuire, the attorney who was in charge of the firm's affairs, and introduced Hartman as a man who would provide a special partner with capital. Hartman thereafter retained McGuire as his attorney in relation to the Singer shares, which had been repledged by the brokers with other banks, and McGuire acted for him in this connection and plaintiff signed the letter notifying the Singer

First Department, July, 1918.          [Vol. 184.

Company not to transfer the 268 shares standing in her name, indorsed in blank with the indorsement guaranteed by Van Schaick & Co., without further authority from her. Plaintiff later assigned to William S. McGuire all her claims against the brokers. On October 10, 1911, Hartman had brought McGuire 400 shares of the Singer stock to be shown as evidence of ability to raise new money for the firm, these shares being represented by four certificates in the name of the plaintiff. The manner by which Hartman came into possession of these shares is not explained, but he had told McGuire that Alexander Mackenzie was the man whom he had in view as the special partner in the brokerage firm on its reorganization, and that both Alexander Mackenzie and plaintiff had taken an interest in one of his alleged Russian enterprises in exchange for Central Railroad of New Jersey stock and Singer stock. The reorganization did not go through, and in connection with perfecting Hartman's rights McGuire was asked to draw such papers as might be required for Mrs. Mackenzie's signature. McGuire was to handle Hartman's affairs generally, including the financing of the latter's other enterprises, the use of plaintiff's stock in the purchase of Tyson & Company (a theatre ticket agency), and in the investment of the proceeds in Hartman's other matters.

On October 31, 1911, plaintiff signed a letter to the New Jersey Title Guaranty and Trust Company, stating that the bearer thereof, Mr. William S. McGuire, was her personal counsel and was authorized to pay the Rouse loan then held by the title company, secured by 250 shares of the plaintiff's Singer Manufacturing Company stock, and directing the company to deliver to Mr. McGuire said certificates of Singer Manufacturing Company stock upon payment by him of the balance due on the loan. On the same date plaintiff signed a letter to the Fifth Avenue Bank stating that the bearer thereof, Mr. William S. McGuire, was her personal attorney and was authorized to pay a loan of $10,000 theretofore made by said bank to her and secured by a certificate for 100 shares of Singer Manufacturing Company stock, and requesting said bank to deliver said certificate to McGuire upon payment by him of the principal of said loan with interest. A similar letter was written by plaintiff to the Hudson County

National Bank, covering 336 shares of stock and 15 bonds. Thereafter and in November, 1911, similar letters were written to the National Park Bank covering 100 shares of stock; to the Manhattan Trust Company, which held a similar amount; and to the Coal and Iron National Bank, where were pledged 68 shares; making up the 268 shares in the Van Schaick loan. Shortly thereafter plaintiff received a telephone message at her country home purporting to be from the New Jersey Title Guaranty and Trust Company, calling her loan with them of about $33,000. When she returned to the city similar messages had been sent there. These in fact never had come from the trust company, but, believing that the loan was about to be called, plaintiff conferred with Hartman and asked him for advice, and he said not to worry, that he would visit the bank and see what could be done, and the next day he returned and said he had seen the bank and that he would take up the loan and pay it off for her, that he had plenty of money and was expecting every day $1,000,000 from England, and out of that would pay off the loan for plaintiff. But plaintiff refused to accept this and said she wished to pay the loan herself. Hartman did not propose to pay off this loan as an advance for plaintiff, but he was doing it on account of his friendship for her, and he said he had so much money that he would not miss the amount. He later reported to her that he had paid off the loan " and taken it [the stock] to the Seaboard Bank and it was in the safety box there," and when plaintiff asked him why he did not bring back the stock he said the back of the stock had been all written up and the Seaboard Bank was going to send to the manufacturing company for a new certificate in place thereof. What had transpired in the interim was that it had been discovered that, instead of 250 shares, there were 1,104 shares in the New Jersey Trust Company, and that the loan there was not a Rouse loan (Rouse being plaintiff's nephew), but a loan made in the name of the plaintiff herself. The trust company having called attention to these errors in the letter dated October 31, 1911, one of its officials noted the necessary corrections to be made in the letter which Hartman returned to McGuire. In the meantime Hartman and McGuire, who met each other every day in McGuire's office, determined that

it was necessary to borrow $100,000 in order to pay off the loan that the New Jersey Trust Company held, and also a further loan of $41,000, approximately, made by the Hudson County National Bank, for which 336 shares of Singer stock and fifteen bonds of the New York and Hoboken Ferry Company had been given as collateral. McGuire asked one Harry Dunn, employed by the defendant brokerage firm of Luke, Banks & Weeks, to negotiate a loan of $100,000 on the Singer Manufacturing Company stock as collateral, and on December 11, 1911, Dunn notified McGuire that he had placed a $100,000 loan with the Seaboard National Bank, and that 600 shares of the Singer Manufacturing Company stock would be required as security. The Seaboard Bank had theretofore made a loan for McGuire on the security of some Singer stock redeemed from the Van Schaick loan. McGuire then redrafted the letter of October 31, 1911, so as to change it to the corrected form desired by the trust company, and delivered it in its corrected form to Hartman, together with a letter to the Singer Company (canceling the previous letter stopping any transfer of the stock), and a receipt to the trust company for the collateral. To these papers Hartman obtained the plaintiff's signature, and she further wrote a letter which she sent direct to the trust company as follows:

> "37 W. 89TH STREET,
> "NEW YORK CITY, *Dec. 7th,* 1911.
>
> "Mr. EVARTS,
> "N. J. Title Guarantee & Trust Co.,
> "83 Montgomery Street,
> "Jersey City, N. J.
>
> "DEAR SIR.— I gave Mr. McGuire as my counsel a letter signed by me authorizing him to take up my loan and receive my collateral. I did this because I have been ill, unable to talk above a whisper and because I wanted the loan paid. I do not like to have these matters discussed over the Phone, especially when I am unable to answer it myself and as this is the second time this has occurred, I prefer to pay the loan and I trust you will act in accordance to my wishes expressed in my previous letter to Mr. McGuire.
>
> "Respectfully,
> "CHARLOTTE L. MacKENZIE."

On the following day, December 8, 1911, McGuire, in company with Dunn, called upon the New Jersey Trust Company, and it is claimed that on the way McGuire informed Dunn that he was acting for a client, that the certificate was in the name of Mrs. Mackenzie in whose name the loan at the trust company was, and that he had authority from her. Dunn, having been advised of the amount required to pay off the loan, had with him the check of Luke, Banks & Weeks for $33,287.36 to the order of the trust company. The check was turned over to the trust company and McGuire delivered to it the following receipt:

"JERSEY CITY, *December* 8, 1911.
" THE NEW JERSEY TITLE GUARANTEE AND TRUST COMPANY,
     " 83 and 85 Montgomery Street, Jersey City, N. J.
" Received at the hands of The N. J. Title Guarantee and Trust Company, Certificate No. 3417 for 1104 shares of Singer Manufacturing Company stock registered in the name of Charlotte L. Mackenzie, dated June 17th, 1910, and duly endorsed ' Charlotte L. Mackenzie '— signature witnessed by William M. Rouse.
                    " CHARLOTTE L. MacKENZIE."

together with the following letter signed by plaintiff:

                    " NEW YORK, *Dec.* 8, 1911.
" N. J. TITLE GUARANTEE & TRUST CO.,
     " 83 Montgomery Street,
               " Jersey City, N. J.
" GENTLEMEN.— The bearer of this, Mr. William S. McGuire, * * * is my personal counsel, and is authorized to pay my loan now held by your company, secured by 1104 shares of my Singer Manufacturing Company stock.
" You will therefore please deliver to Mr. McGuire said certificate of Singer Manufacturing Company stock for 1104 shares, upon payment by him of the balance due you on this loan with interest.
               " Yours truly,
                    " CHARLOTTE L. MacKENZIE.
" The foregoing is Mr. McGuire's signature, which will serve to identify him to you."

The trust company turned over the stock to McGuire, who handed the stock to Dunn, together with a letter signed by the plaintiff and directed to the Singer Manufacturing Company as follows:

"NEW YORK, *Dec.* 8, 1911.

"SINGER MANUFACTURING COMPANY,
        "149 Broadway,
                "New York City.

"GENTLEMEN.— Some months ago I notified you to make no transfers of any certificates of stock issued in my name. The circumstances which necessitated this notice have now passed, and you will please cancel the same, accepting for transfer whatever certificates standing in my name may be offered to you.

            "Very truly yours,
                "CHARLOTTE L. MacKENZIE."

Dunn returned to New York, sent the letter to the Singer Company, and then took the certificate for the 1,104 shares to the Seaboard National Bank together with the following letter from McGuire:

                        "*Dec.* 8, 1911.

"SEABOARD NATIONAL BANK,
            "New York City.

"GENTLEMEN.— Herewith I hand you certificate No. 3417 for 1104 shares of Singer Manufacturing Company stock, standing in the name of Charlotte L. Mackenzie.

"I hereby authorize you to transfer 600 shares of this stock to the name of Bertram I. Dadson, and to hold said 600 shares as collateral for the loan of $100,000 made to me this day for 90 days at $5\frac{1}{4}\%$ per annum.

"Please be good enough to transfer the remaining 504 shares back to the name of Charlotte L. Mackenzie and return it to me.

            "Very truly yours,
                "W. S. McGUIRE."

Thereupon the Seaboard National Bank gave to Dunn its check to the order of McGuire for $100,000, which, after McGuire had indorsed it to them, Luke, Banks & Weeks deposited, paid themselves therefrom their advances to

redeem the stock (together with a commission of $250, the agreed brokerage fee), and gave McGuire their check for the balance, out of which the next day he redeemed the 336 shares from the Hudson County National Bank and paid off the loan there of approximately $41,000. The assistant cashier of the Seaboard Bank noticing the clause by which 504 shares remained the property of plaintiff, consulted the bank's attorney as to what should be done, and was advised that it would be better to get an additional letter from plaintiff as to these shares. This conversation with the attorney took place while the messenger was waiting for the check. After having delivered the check for the loan, the assistant cashier called up Dunn and inquired what were the relations between plaintiff and McGuire, whereupon Dunn informed him that McGuire was her attorney and the stock was hers. The cashier made his request for a letter covering the transaction and such a letter was prepared by McGuire in consultation with Dunn and delivered to Hartman to get plaintiff's signature. Hartman failed to return this draft of the letter, saying that he had mislaid it, and instead thereof he brought back the following letter, which he said he had prepared from memory of the original:

"NEW YORK CITY, Dec. 26th, 1911.
"SEABOARD NATL. BANK,
            "18 Broadway,
                    "New York.

"DEAR SIRS.— I will appreciate if you will follow Mr. McGuire's instructions in reference to transferring shares of mine.                    Respectfully,
                    "CHARLOTTE L. MACKENZIE.
"O. K. by
Mr. H. Aaron
over phone
12/26/11
DeV."

(All in handwriting of Mrs. Mackenzie except notation at bottom.)

This letter was submitted to the bank's attorney, who approved it. Plaintiff claims that she was induced to sign

this letter by Hartman's representation that it was necessary for her to write it so that the Seaboard Bank could take the letter to the Singer Company and get a new certificate of stock.   On January 4, 1912, the bank sent the stock for transfer, and on January eleventh the bank delivered to Dunn on McGuire's order the 504 shares representing the amount of the stock outside the loan, represented by five certificates for 100 shares each and one certificate for 4 shares, the remaining 600 shares represented by one certificate in the name of Bertram I. Dadson, an employee of the bank, remaining in possession of the bank as security for the $100,000 loan. This is the date, January 11, 1912, on which the jury by its verdict found that the conversion took place both as to the bank and the brokers, and the plaintiff's recovery herein is based on the value of the 1,104 shares on that date, less the amount paid to the New Jersey Trust Company to satisfy plaintiff's loan therein.   In the meantime plaintiff had signed six blank powers of attorney for the transfer of the stock at Hartman's request.   Utilizing the seblank transfers, 200 shares were used in the purchase of the stock in the Tyson Company, 4 shares were delivered to Hartman and sold by him, and the remaining 300 shares were deposited with the bank as collateral to a further loan of $60,000 to McGuire on January 24, 1912, after they had been transferred into one certificate for said 300 shares in the name of Harry Dunn, the employee of Luke, Banks & Weeks.   Thus the bank held 900 shares out of the 1,104 shares originally owned by the plaintiff, as security for two loans to McGuire aggregating $160,000.   When the $100,000 loan became due in March, 1912, it was paid off and the collateral repledged for a new loan to McGuire of $120,000.   About October 21, 1912, the bank's loans had all been repaid and the stock returned to McGuire, who sold it and paid the proceeds to Hartman, or used it in Hartman's enterprises on his order.   The stock which came back from the Hudson County National Bank and from other financial institutions in like manner was applied to Hartman's use, and no part thereof ever was returned to the plaintiff. Plaintiff had testified that Hartman had agreed to give her $1,000,000 out of his profit from his Russian ventures, and she admits that he was worried and wanted her to let him

have her securities to help him for a few days as his money was always expected from abroad, and he took her often to the United Express office and the Seaboard Bank to see if the money had arrived. But she insisted that these loans of securities had nothing whatever to do with the Singer stock. Plaintiff claims to have made repeated requests for the delivery of her stock which she professes she still expected to have returned to her, and says that Hartman gave various excuses such as that the Singer Company was dilatory; that Dunn was the transfer clerk of the Singer Company and dividends were paid through him until the new certificate was issued; that the stock had been transferred and returned to McGuire who had it in his safe deposit box in the Seaboard Bank, and various excuses were made why Hartman did not get it and turn it over to the plaintiff. The quarterly dividends on the Singer stock up to December, 1911, had been $6,120. When the dividends became due March 30, 1912, which is the first payment following the alleged conversion, plaintiff's check amounted to only $2,412, but she received a check of the Singer Company for $1,908, payable to Harry Dunn, and by him indorsed to the order of McGuire, and by the latter to her order, and a further check for $1,800 payable to McGuire. and by him indorsed to her. These three checks made up the aggregate of $6,120, the total amount of her quarterly dividend, but she professes that though she knew they were for Singer dividends she never suspected that her stock had been transferred and that that was the reason why the dividends came in checks payable to other persons. She claims to have relied upon Hartman's excuses and never had her own doubts aroused thereby, though she was aware from prior personal transactions that when dividends came in that form it meant that the stocks on which the dividends were paid had been pledged. Her explanation of how these checks came to be payable to McGuire was that he was Hartman's attorney and that was all she knew. Subsequent dividends in July and October, 1912, and January, 1913, paid by bank drafts by McGuire, were explained to her upon the theory that Hartman had guaranteed the payment of the dividends on the Singer stock pending the transferring of his Russian securities. The dividends were paid by McGuire to April, 1913, when the

First Department, July, 1918.          [Vol. 184.

money was all gone, and then plaintiff admits that she realized that her stock had been sold when her dividends ceased. After that date Hartman gave her $1,000 and again $250, but McGuire, who claims by this time to have discovered Hartman's duplicity, refused to consent to any further deception. In December, 1913, plaintiff consulted attorneys and in January, 1914, she met McGuire, Hartman accompanying her. Leaving her outside the hotel at which the meeting took place, Hartman first cautioned McGuire not to tell plaintiff of the sale of her stock, saying the shock would kill her, and within a week he would supply funds to take care of everything. McGuire said he would give Hartman two weeks to provide the funds, and then would give plaintiff a full statement. McGuire thereupon went to plaintiff, who was still in the cab, and told her he would give her a statement of her affairs in two weeks, but nothing further. Hartman next persuaded plaintiff to retain counsel of his selection in an effort to fasten responsibility on McGuire, but plaintiff pursued her own course, selected attorneys of her own, and finally commenced criminal proceedings against Hartman. As the result of her experiences with Hartman, plaintiff became insolvent and the coplaintiff herein is the pledgee of her cause of action against the defendants, who is acting on behalf of her creditors. The present action was commenced May 28, 1915. It should be noted that the plaintiff's son-in-law became vice-president of Tyson & Company, in which money realized from the sale of part of her 504 shares returned to Dunn was used.

The foregoing is but an outline of the involved and extended details of the transactions between the parties, as the result of which plaintiff has lost all her securities. The defendants, appellants, contend that the plaintiff consented to the use of her stocks by Hartman and understood thoroughly what was being done with them both by Hartman and McGuire. They further claim that they acted in perfect good faith; that whatever loss was occasioned was due to plaintiff's own acts, and that the letters and documents which she signed alone made possible the perpetration of any fraud upon her or caused any loss to her; that they had no notice of her ownership nor reason to suspect the same, nor occasion to make any inquiries in view of the papers produced to them, and, finally, that the

plaintiff had ratified and accepted the acts of McGuire and was in no position to question the same, particularly as she acquired knowledge of the transactions complained of in January, 1914, and took no action thereupon and gave no notice of repudiation until the commencement of this action, nearly seventeen months later.

It is the contention of the plaintiff that the evidence justified the finding that the stock in question was stolen by Hartman, who originally obtained it fraudulently from plaintiff with the intention on his part of converting it to his own use, while the plaintiff intended merely to part with the possession of the stock and not with the title thereto; that the letter of December 26, 1911, was not actual or apparent authority to transfer 600 shares in pledge for McGuire's personal loan; that the appellants are not entitled to credit for any stock returned to McGuire; that plaintiff never ratified the transactions and was not guilty of any laches in relation thereto; that plaintiff never gave her consent to the use of her 1,104 shares certificate by Hartman or by McGuire for Hartman's purposes; and that plaintiff was an innocent victim of Hartman's perfidy, who, being inexperienced in business matters and without knowledge of the consequences of her act, was induced to sign any papers which Hartman placed before her, accepting his statement as to their purpose and effect and without appreciating the legal consequences of her acts. That she signed the papers in question there is no dispute. Nor does she attempt to deny the implicit faith and confidence which she had reposed in Hartman whose glowing pictures of his wealth and influence and of the prospective profits which he was about to realize from his Russian and other enterprises evidently impressed and convinced her. If she really believed that Hartman was personally paying off her loan with the New Jersey Trust Company it is difficult to believe that she would have allowed the stock to remain out of her possession so long without making any efforts to regain it. If she in fact invested Hartman's attorney with the power and with the evidences of ownership with which to handle her stock so as to pay off the New Jersey loan and then repledge the stock elsewhere for the amount of that loan or for any further sum that Hartman might desire, her conduct becomes more in harmony with the undisputed

writings. It is unfortunate that plaintiff placed her confidence in a swindler, but for that confidence none of the defendants is liable, and she herself created the situation and placed it in the power of this adventurer to impose upon her and others. It should be noted that upon the record before us there is no attack upon the honesty or good faith of McGuire, who seems to have implicitly followed the instructions of Hartman, who was his client, and who by reason of that relationship became involved in these matters through his retainer by Hartman to represent Mrs. Mackenzie as well. And of course the papers produced for his inspection with great regularity by Hartman, signed by Mrs. Mackenzie as and when they were required, gave him every reason to believe that Hartman was in fact and truth the trusted adviser, representative and friend of the plaintiff, which all the parties concerned then believed him to be. Plaintiff's explanations of how she came to remain quiescent so long in the face of evidence, not only suspicious but convincing, that her stock had been parted with to third parties are unsatisfactory and almost frivolous. The manner in which her dividend checks reached her, made out to third parties and indorsed by them to her and then followed by McGuire's bank drafts, gave her notice that her stock had passed to other hands either permanently or temporarily, and as she had knowledge from past experience of how dividends were paid on pledged stock the conclusion is irresistible that she knew from the time her dividends first reached her in the altered form that the stock was no longer in her name. Then the entire cessation of dividends was a danger signal which no one would have disregarded who really believed that she still owned the stock. A careful examination of the record, with every disposition to make allowance for the unfortunate position in which the plaintiff found herself at the time of the trial and the consequent lapse of memory upon her part, still cannot explain the manner or substance of her testimony on the vital points in the case nor reconcile that testimony with the undisputed facts and the unavoidable inferences. She had placed McGuire in the position where he had possession of her stock certificates accompanied by blank transfers and powers of attorney executed by her. She imposed no limitations of any kind upon

his authority, and, being neither an inexperienced nor an unintelligent woman, must be charged with the natural consequences of her acts.

To the defendants the transaction must have seemed a normal and usual one. It was simply the taking up of a loan in one financial institution and the obtaining of a larger loan from another based on collateral which, upon its face and upon the documents presented therewith, was properly pledged for the new loan. It is true that there are some circumstances which are urged with great vigor by the plaintiff as bringing home to the defendants notice of fraud or at least putting them upon notice and making it their duty to inquire as to the circumstances. Such, for instance, as the testimony that McGuire told Dunn that he was acting for a client, whereby notice was given that McGuire was not himself the owner of the certificate. Further, the doubt raised in the mind of the assistant cashier of the Seaboard Bank as to the sufficiency of the paper signed by plaintiff by which the 504 shares remained after the pledge to the bank, wherefore the cashier took advice from the bank's attorney and required an additional paper signed by the plaintiff, which was furnished. And there are other circumstances, taken in connection with plaintiff's own testimony, which cannot be disregarded, and make it impossible to treat the question involved as one solely of law. We believe that there were questions of fact required to be submitted to the jury: *First*, did plaintiff understand and assent to the fact that her stock was being used and transferred by Hartman or McGuire or both; *second*, did the defendant bank know, or should it have known upon reasonable inquiry, when it dealt with the shares in question that they were the property of the plaintiff and were being misappropriated; *third*, did the defendants Luke, Banks & Weeks know, or should they have known upon reasonable inquiry, that they were misappropriating the plaintiff's stock; *fourth*, did plaintiff, with knowledge of the facts, ratify the acts of Hartman or McGuire or both; *fifth*, did she have knowledge of the facts at a time long enough prior to the commencement of this action to charge her as a matter of law, by reason of her laches or failure to

First Department, July, 1918.          [Vol. 184.

repudiate and the absence of any demand, with having impliedly ratified the actions of Hartman or McGuire or both. We believe the findings of the jury in favor of the plaintiff upon all five of these issues are against the weight of the evidence.

The conclusions thus reached make it unnecessary to discuss the errors which are assigned in the charge of the trial court, or the other assignments of error argued upon the briefs herein.

The judgment and order appealed from will be reversed and a new trial ordered, with costs to the appellants to abide the event.

CLARKE, P. J., SMITH, PAGE and MERRELL, JJ., concurred.

Judgment and order reversed and new trial ordered, with costs to appellants to abide event.